[No. A019474. First Dist., Div. Two. Mar. 5, 1986.]

PETER KIEWIT SONS' COMPANY, Plaintiff and Respondent, v.
RICHMOND REDEVELOPMENT AGENCY, Defendant and Appellant.

438

**COUNSEL**

Malcolm Hunter, City Attorney, and Patricia Ann McKinley, Assistant City Attorney, for Defendant and Appellant.

Gary R. Rinehart for Plaintiff and Respondent.

**OPINION**

**ROUSE, J.**—Defendant appeals from a judgment granting a peremptory writ of mandate which directed it to find plaintiff to be a displaced person within the meaning of Government Code section 7260, subdivision (c)[1] and to determine the amount of relocation benefits to which plaintiff is entitled under section 7262.

In September 1977, the Richmond Redevelopment Agency (Agency) purchased approximately 362 acres, some of it submerged, from Santa Fe Land and Development (Santa Fe). At the time plaintiff occupied some 64 acres of the property under a lease from Santa Fe. Plaintiff had used the 64-acre site under a succession of leases originating in the early 1950's for marine

---

[1]All subsequent references are to the Government Code unless otherwise noted.

construction and concrete precasting activities. The lease in effect at the time of the purchase had been entered into in 1972, and then extended by a supplemental agreement in 1976, with an expiration date of March 31, 1980. No new lease was ever executed between the Agency and plaintiff.

Redevelopment of the Santa Fe land was under study as early as 1971. By 1975 an urban renewal plan for the area had been adopted. Before Santa Fe sold its property to the Agency it had contemplated developing the property under an "owner participation agreement" with the Agency. Accordingly, the 1976 extension of plaintiff's lease recited, as part of the consideration for the extension, plaintiff's waiver of its right to relocation benefits from Santa Fe should it be forced to move before March 31, 1980, in the event "a Redevelopment Plan for such Project Area is adopted and Lessor [Santa Fe] enters into such an owner participation agreement."

Plaintiff's business was incompatible with the development project planned by Santa Fe. Thus, as early as 1973 plaintiff began looking for a new site for its operations. On November 1, 1975, plaintiff signed a 25-year lease with the City of Vallejo for a new site.

When title to the Santa Fe property passed to the Agency, it notified plaintiff that it would "assume the existing leases . . . ." Plaintiff was also assured that, although the Agency's long term plans would eventually involve plaintiff's parcel, there was no immediate plan to develop the site.

Beginning in 1979 plaintiff met with the Agency in an effort to negotiate an agreement permitting plaintiff to continue to occupy its Richmond site beyond the scheduled March 31, 1980, expiration of the lease. No mutually acceptable agreement was reached. Plaintiff was unwilling to pay increased rent or to waive its relocation benefits. On October 5, 1979, the Agency notified plaintiff in writing that if plaintiff intended to occupy the property beyond March 31, it would have to do so under a new lease. The letter of October 5 was sent in response to plaintiff's ultimatum that it needed at least six months in which to move its operations and equipment from the Richmond site.

On March 31, 1980, plaintiff had not vacated. The following day it tendered the amount of monthly rent it had been paying under its lease. The Agency declined to accept the rent, and instituted an action for unlawful detainer. On September 30, 1980, before the unlawful detainer action was tried, plaintiff vacated. The unlawful detainer action was eventually resolved by settlement.

On April 11, 1980, plaintiff filed a claim for moving expenses with the Agency in the amount of $2,621,146. The claim was denied by the Agency, and that denial was upheld by the Agency's board of appeals. Plaintiff sought a writ of mandate (Code Civ. Proc., § 1094.5) and brought an action for declaratory relief. After trial to the court, a judgment was entered directing issuance of a writ requiring the Agency to set aside its decision denying relocation benefits to plaintiff. The Agency timely appeals.

## I.

In its statement of decision the trial court concluded that Code of Civil Procedure section 1265.110 operated to extinguish plaintiff's leasehold at the time defendant acquired for public use the property subject to that lease. Defendant contends that section 1265.110 does not apply to acquisitions by purchase but only to acquisitions by eminent domain.

Code of Civil Procedure section 1265.110 provides: "Where all the property subject to a lease is acquired for public use, the lease terminates." The question of the section's construction is apparently one of first impression.

On its face the language of the statute seems clear. By using the word "acquired" the section does not explicitly limit the process of acquisition to an eminent domain proceeding. This broad reading of the statute comports with the comment of the Law Revision Commission which explains that the section "codifies the rule that the taking of the entire demised premises for public use by eminent domain or agreement operates to release the tenant from liability for subsequently accruing rent." (See Cal. Law Revision Com. com. to Code Civ. Proc., § 1265.110.)

As authority for this proposition, the comment cites *City of Pasadena* v. *Porter* (1927) 201 Cal. 381 [257 P. 526], and *Carlstrom* v. *Lyon Van & Storage Co.* (1957) 152 Cal.App.2d 625 [313 P.2d 645]. Neither case involved acquisition by purchase, as both were condemnations. (*City of Pasadena, supra,* at p. 383; *Carlstrom, supra,* at p. 627.) Both cases involve a total, as distinguished from a partial, taking. They stand for the proposition that the taking of a whole property or the taking of all of a leasehold term extinguishes the lease, whereas a lesser taking, of part of the leased property or only a portion of the term, does not extinguish the lease. (*City of Pasadena, supra,* at p. 387; *Carlstrom, supra,* at p. 627.) Here all the property leased by plaintiff was acquired, therefore it was a total taking. Neither case cited by the Law Revision Commission comment therefore is dispositive of the issue before us, namely, whether a public entity's acquisition by *purchase* of property for public use will trigger

Code of Civil Procedure section 1265.110 to extinguish any leasehold interest in that property.

The rationale which underlies the rule extinguishing a lease where the underlying fee is acquired in eminent domain has been variously stated. According to the Restatement, the exercise of eminent domain takes both the underlying fee and the leasehold interest, thus destroying the latter. (Rest.2d Property, § 8.1(1), com. a, pp. 260-261.) Another commentator describes a taking by eminent domain as an exercise of paramount title which does not evict the tenant, and does not therefore give the tenant an action against his landlord for breach of the landlord's covenants. Unless the lease terminates at the taking, the tenant's duty to pay rent continues although he has lost any right to proceed against his landlord for disturbance of his right to possession. (2 Nichols, Eminent Domain (3d ed. 1985) § 5.06[3], p. 5-117.)

Defendant contends, however, that the conceptual model applicable to leases where the taking is by eminent domain is inappropriately applied when a public entity acquires land for public use by negotiated purchase. In that circumstance, defendant maintains, the public entity should be treated like any other purchaser.   ■   Absent a contrary agreement of the parties, "a sale by a lessor of real property during an unexpired term does not of itself abrogate the lease. Its effect is to grant all the rights of the original lessor to the grantee of the reversion. The grantee then becomes the landlord by operation of law and the tenant becomes a tenant of the grantee of the reversion." (*Rosenkranz* v. *Pellin* (1950) 99 Cal.App.2d 650, 652 [222 P.2d 249]; *Commonwealth Memorial, Inc.* v. *Telophase Society of America* (1976) 63 Cal.App.3d 867, 870-871 [134 Cal.Rptr. 58].)   ■
Defendant argues that in accepting assignment of Santa Fe's interest in its lease with plaintiff, defendant merely stepped into Santa Fe's shoes and the lease continued in force for its full term.

However, plaintiff argues that the eminent domain law, of which Code of Civil Procedure section 1265.110 is a part, is intended to be a comprehensive scheme for regulating acquisitions for public use, regardless of whether that acquisition is by condemnation or by purchase. Admittedly the stated purpose of the recent revision of the eminent domain statutes was to provide "one uniform statute applicable to all condemnors and all condemnation proceedings." (The Eminent Domain Law, 13 Cal. Law Revision Com. Rep. (1976) p. 1011.) However, plaintiff points to nothing in the newly codified law which requires its application to a purchase situation.

Instead, plaintiff relies upon *Concrete Service Co.* v. *State of California ex rel. Dept. Pub. Wks.* (1969) 274 Cal.App.2d 142 [78 Cal.Rptr. 923],

for the proposition that the eminent domain statutes have always applied to purchase situations. *Concrete Service* involved an attempt by the state highway department to avoid paying for a tenant's concrete "batch plant"—consisting of buildings, garages, tanks and equipment. Initially, the highway department appraised the property, including the tenant's batch plant, for condemnation purposes. Upon learning that the tenant was occupying the land on a month-to-month tenancy, the department, instead of instituting condemnation proceedings which would have required it to reimburse the tenant, bought the underlying fee and then terminated the tenancy, demanding delivery of the land free of tenant improvements. In holding the action to be subject to the eminent domain law the court found that the method used to acquire the property "constituted condemnation or its substantial equivalent." (*Id.*, at p. 147.) Properly read, *Concrete Service* is authority for the proposition that the strictures of eminent domain law may be applied to purchase situations where the substance, if not the form, of the public taking is by condemnation. The case does not create an inflexible rule that all public purchases are automatically subject to the same rules applicable to eminent domain actions.

While the Law Revision Commission comment and *Concrete Service* provide authority for the proposition that Code of Civil Procedure section 1265.110 could be applied to purchases, neither the statutory scheme nor the existing case law require an across-the-board rule that the section extinguishes an existing lease whenever a public entity purchases land for public use.

If Code of Civil Procedure section 1265.110 is applied to public entity purchases then it could ensure that tenants would not be deprived of compensation for the taking of their tenancies, and it would give tenants leverage in negotiating with the acquiring agency where both are willing that the tenant remain on the property postacquisition. On the other hand, applying section 1265.110 across the board to all acquisitions would also impose a substantial burden on public entities. Such blanket application would mean no public entity would have any incentive where there was an existing lease to negotiate a purchase rather than proceed by condemnation. Given the time and expense involved in condemnation, it seems counterproductive to read Code of Civil Procedure section 1265.110 so as to encourage condemnation. On balance, we find the better solution is to read the section as applying only to acquisitions by eminent domain, unless the conduct of the acquiring public entity is the "substantial equivalent" of condemnation and fairness requires applying section 1265.110 to the acquisition by purchase.[2]

---

[2]The trial court was troubled by the potential unfairness of permitting effective condemnation through the buyout process. However, it seems to have linked two not necessarily

In this case defendant Agency has not engaged in a pattern of conduct designed to evict plaintiff from the site, or to take the balance of its tenancy without compensation. Plaintiff received everything it had bargained for under its lease with Santa Fe. It complained at trial that it was unable to renegotiate a new lease with defendant, but had Santa Fe continued to own the property and proceeded with development there was no guarantee that any new lease on acceptable terms would have been forthcoming from Santa Fe. Development of the land by some party was imminent. Even Santa Fe's proposed project was apparently incompatible with plaintiff's use of the property which involved unsightly cranes and equipment.

Accordingly, we find that the trial court erred in holding that Code of Civil Procedure section 1265.110 operated to terminate plaintiff's lease at the time defendant acquired the property.

## II.

Relocation assistance under California law is both a reflection of, and a response to, similar assistance provided by the federal government. Beginning in 1956, federal law permitted payment of relocation benefits for "reasonable and necessary moving expenses." (Act of Aug. 7, 1956, ch. 1029, tit. III, § 305(f)(2), 70 Stat. 1100.) In 1970 federal legislation was passed which required state compliance with certain requirements as a precondition to receipt of federal funds. (42 U.S.C. §§ 4622-4625, 4655.) In 1971 state legislation, the California Relocation Assistance Law (CRAL), was passed to bring California into compliance with the federal scheme and to extend state relocation benefits to persons displaced by purely state or local acquisitions. (Stats. 1971, ch. 1574, § 1.8 et seq., p. 3154; *City of Mountain View* v. *Superior Court* (1975) 54 Cal.App.3d 72, 78 [126 Cal.Rptr. 358].)[3] State law closely parallels its federal model in defining who is a displaced person and eligible for relocation benefits. (See 42 U.S.C. § 4601(6).)

related statutes, Code of Civil Procedure section 1265.110 with the relocation assistance provisions of the Government Code. That linkage puts the cart before the horse. Whether or not a tenant is entitled to relocation benefits must turn on whether he is a displaced person as defined by section 7260, subdivision (c). The issue of the survival of the tenant's lease may have an impact on the displaced person determination, but need not do so. For example, a tenant under a surviving lease might still be a displaced person if the acquiring agency caused his immediate departure with a notice to vacate before the end of the lease term.

[3]For a fuller discussion of the history of the California legislation, see Comment, *Relocation Assistance in California: Legislative Response to the Federal Program* (1972) 3 Pacific L.J. 114, 116, footnote 20; and *City of Mountain View* v. *Superior Court, supra,* 54 Cal.App.3d 72, 77-78.

Under CRAL (§ 7260 et seq.), state relocation benefits are available to a displaced person who is defined as "any person who moves from real property, or who moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, by a public entity . . . or as the result of a written order from a public entity to vacate the real property, for public use." (§ 7260, subd. (c).) The benefit payments compensate the displaced person for his "[a]ctual and reasonable expense in moving himself, family, business, or farm operation, including moving personal property." (§ 7262, subd. (a)(1).)

■ Actual exercise of the power of eminent domain is not prerequisite to eligibility for relocation benefits. (*Superior Strut & Hanger Co.* v. *Port of Oakland* (1977) 72 Cal.App.3d 987, 993-994 [140 Cal.Rptr. 515].) The crucial issue in determining eligibility for benefits is whether there is a "causal connection between the acquisition [by the public entity] and the displacement which brings into play the provisions" of CRAL. (*Stephens* v. *Perry* (1982) 134 Cal.App.3d 748, 755 [184 Cal.Rptr. 701].)

■ In reliance upon three cases, the trial court found plaintiff to be a displaced person within the meaning of section 7260, subdivision (c). The cases which the trial court found controlling involved tenants occupying land under leases in force at the time of the public acquisition.

Two of the cases relied upon concern a single fact pattern. (*Albright* v. *State of California* (1979) 101 Cal.App.3d 14 [161 Cal.Rptr. 317]; *Topanga Beach Renters Assn.* v. *Department of General Services* (1976) 58 Cal.App.3d 188 [129 Cal.Rptr. 739].) In *Albright* and *Topanga*, the state purchased the fee interest in land subject to leaseholds which were shortly due to expire. After condemning the leasehold interests, the state informed the lessees that at the expiration of their leases the tenancies would become month-to-month. (*Topanga, supra,* at p. 191.) At some subsequent point the tenants who had not left were given termination notices. (*Albright, supra,* at p. 17.) Although the question of whether the tenants were displaced persons within the meaning of section 7260, subdivision (c), was not directly at issue in *Albright,* the effect of the court's ruling was to find that the tenants were "displaced persons."

In the third case relied upon by the trial court, *Superior Strut & Hanger Co.* v. *Port of Oakland, supra,* 72 Cal.App.3d 987, the tenant occupied a building which was acquired by the port. Because it had no immediate need for the property, the port entered into two agreements providing for the tenant's continued occupancy. When the tenant failed to move after receiving a notice terminating its tenancy, the port apparently relented, continuing

to accept rent and making no move to oust the tenant. (*Id.,* at pp. 992-993.) Finding that the port had acquiesced in the tenant's continued occupancy by accepting rent, the court concluded that the tenant was not in unlawful possession and therefore was a displaced person within the meaning of section 7260, subdivision (c). (*Id.,* at p. 997.)

The ruling in *Superior Strut* is in accord with *Baiza* v. *Southgate Recreation & Park Dist.* (1976) 59 Cal.App.3d 669 [130 Cal.Rptr. 836]. In *Baiza,* a tenant in possession at the time of acquisition remained postacquisition as a month-to-month tenant. When he failed to pay his rent and was served with a three-day notice to pay or quit, he elected to quit. Accordingly, the court found Baiza's departure was not the result of an "acquisition" or "a written order from a public entity to vacate the real property for public use" (§ 7260, subd. (c)), but a result of Baiza's breach of his landlord-tenant agreement. (*Id.,* at p. 674.)

Reading *Superior Strut, Albright* and *Baiza* together, the rule which controls is this: a tenant holding under a lease which has not expired at the time property is acquired for public use and who continues lawfully in possession of the premises after termination of the lease will qualify as a "displaced person" under section 7260, subdivision (c).

In the case before us, plaintiff's status as a lawful possessor of the property turns upon whether there was a lease in force as of March 31, 1980. ■ When the term of a lease expires but the lessee holds over without the owner's consent, he becomes a tenant at sufferance. (*Colyear* v. *Tobriner* (1936) 7 Cal.2d 735, 742 [62 P.2d 741, 109 A.L.R. 191].) "Since the possession of the tenant at sufferance is wrongful, the owner may elect to regard the tenant as a trespasser . . . ." (4 Miller & Starr, Current Law of Cal. Real Estate (rev. ed. 1977) § 27.15, p. 253.) If instead the owner accepts rent from a tenant at sufferance he accepts the tenant's possession as rightful and the tenancy is converted into a periodic one. (*Ibid.;* Civ. Code, § 1945.) ■ When defendant refused plaintiff's tender of rent defendant was electing to treat plaintiff's continued possession as unlawful. The leasehold here did not, by operation of Code of Civil Procedure section 1265.110, terminate in 1977 at the time defendant acquired the property from Santa Fe. The lease terminated, by its own terms, as of March 31, 1980.

We find that *Baiza* controls, since the *cause* of plaintiff's departure was neither defendant's acquisition nor an order from it to vacate (§ 7260, subd. (c)), but plaintiff's unlawful possession of the premises after expiration of its lease.

The judgment is reversed and the matter remanded with directions to the trial court to enter its order denying plaintiff's petition for a writ of mandate.

Kline, P. J., and Smith, J., concurred.

A petition for a rehearing was denied April 4, 1986, and respondent's petition for review by the Supreme Court was denied May 28, 1986.